THE STATE *v.* McGINLEY.

The act of 1848 authorizing a reference of the claim of *Patrick McGinley* against the state to three disinterested persons, to be appointed by the governor, enacted that two of such persons should be men of legal attainments, &c. *Held,* that the act was merely directory to the governor, and that his action in the premises could not be reviewed.

Nov. Term,
1852.

THE STATE
v.
McGINLEY.

That act made it the duty of the Supreme Court, on an appeal from the award of the arbitrators, to examine the case upon its merits.

The legislature, by authorizing an appeal to the Supreme Court from the award of the arbitrators, intended that said Court should be governed by the rules of law applicable to ordinary suits.

By the contract between *McGinley* and the state, the engineer, in case *McGinley* should fail to comply with his contract, might declare it forfeited and null; the state might withhold 10 per cent. of the work performed; and might relet the job to another. The engineer made the declaration; and *McGinley* brought suit, alleging that the declaration was wrongly made. *Held,* that the proof of the allegation devolved upon him.

A member of the board of public works could not, under the internal improvement act of 1836, approve or disapprove of a contractor's work.

The contract between *McGinley* and the state, after prescribing what things should be done and omitted by the engineer or his assistant, provided that the contractor was in all things to follow the directions of the engineer or his assistant. *Held,* that he was only authorized to follow the engineer or his assistant in those things wherein they had a right to direct him.

*Friday,*
*December 24.*

APPEAL from the *Floyd* Circuit Court.

PERKINS, J.—This was a proceeding instituted by *McGinley*, under a special statute, to recover damages from the state for an alleged breach of contract. The case is as follows:

On the 1st of *March*, 1837, the state of *Indiana*, by *David H. Maxwell*, one of the commissioners of public works, entered into a contract with *Patrick McGinley* for the building by said *McGinley* of a stone bridge over *Silver* creek, on the line of the *Jeffersonville* and *Crawfordsville* road. In the contract *McGinley* agreed to build said bridge in a substantial and workmanlike manner, "at the rate of 7 dollars and 75 cents per perch of twenty-five cubic feet, all excavations for foundations included in the above price, and the bridge to be built according to the plan furnished by the principal or resident engineer on said road." The payments were to be upon monthly estimates, ten per cent. being withheld as a forfeit, should the contractor fail in fulfilling his agreement. It was also stipulated that should *McGinley* refuse at any time to conform to the directions and instructions of the engineer, or in any manner violate the contract, the engineer

should have power to declare the contract forfeited, &c. And further, that in case of any difference arising between the parties as to the construction of the agreement, the decision of the engineer should be final in the premises. No particular specifications as to the manner in which the work was to be done appear to have been furnished in writing at the letting, but Mr. *Pettit*, the chief engineer, says that it was to be executed like that of the *Wills* creek bridge on the *Cumberland* road, which he thus describes: "The masonry in the abutments rock-work, the beds and joints of all the stone in the face of the work being cut to regular surfaces. The backing is composed of stones having parallel beds and tops, of which not more than two should be used to equal the front stone in the height, and no stones were admitted of less than two cubic feet in contents, except the spalls necessary to fill interstices. The whole was laid in mortar made of sand and lime. Headers were used in front of the abutments, and in the whole work. Their average length was probably about four feet, although many were more. The distance between the headers varied from seven to twelve feet, depending in a measure on the kind of stone used for ashler. No stone was admitted having more height than bed." Mr. *Pettit* further states, that at the time of the letting said *Silver* creek bridge, he described to *McGinley* the character of the work, so that he understood it, and referred him " to the bridge across *Wills* creek as exhibiting the character of the masonry required in the *Silver* creek bridge, which reference was made to enable him to bid understandingly." *Jesse L. Williams*, who subsequently became chief engineer, also states that *McGinley* informed him that the work was to conform to that of the *Wills* creek bridge. This evidence does not appear to have been objected to, and was probably legally admissible; but the case is clearly made out, as will hereafter be seen, independently of it, in favor of the state.

*McGinley* commenced working upon his job. He was subsequently arrested in his operations by the following declaration:

Nov. Term, 1852.

THE STATE v. McGINLEY.

"Whereas, on the 5th of *October* last, the contractor for the *Silver* creek bridge was directed by the principal engineer to take down certain portions of the masonry on account of its imperfect character, and whereas the contractor refused to follow such directions, but continued his operations, covering up the defective work; therefore, in performance of my duty to the state, and by virtue of authority vested in the engineer by the terms of this agreement, I hereby declare the within contract forfeited, null, and void. *Dec.* 11th, 1837. *R. H. Fauntleroy*, resident engineer on the *Jeffersonville* and *Crawfordsville* road."

The plan of the bridge was then changed, a wooden structure instead of a stone arch being placed upon the abutments. This was done, say some of the witnesses, on account of the defective character of the masonry in the abutments so far as laid by *McGinley*, a wooden structure being lighter than an arch of stone.

The completion of the stone work was relet to *Moulton* and company at the rate of 10 dollars per perch.

The amount paid to *McGinley* while prosecuting the work was 21,814 dollars. He afterwards presented a claim to the board of internal improvement for a further allowance, and they rejected it.

In 1839, the legislature, by a joint resolution, authorized *McGinley* to sue the state on his alleged claim, and the suit was prosecuted in the *Floyd* Circuit Court. That Court gave him a judgment for 13,500 dollars. The case was appealed to the Supreme Court, where judgment was rendered against *McGinley* for costs, the Court holding him entitled to no further compensation, nor to damages, on his contract. In 1848, an act was passed by the legislature authorizing his claim to be heard in *Floyd* county, by arbitrators appointed by the governor. The appointments were made by governor *Dunning*, the cause heard, and said arbitrators awarded to *McGinley* the sum formerly adjudged to him by the *Floyd* Circuit Court, together with interest during the intervening time, making in all 21,143 dollars. The award was filed in the clerk's

office of *Floyd* county, and an appeal taken therefrom to this Court.

The bill alleges that *McGinley* did not fail in the fulfillment of his contract, and that the state, therefore, wrongfully declared it forfeited. It further alleges that he had performed extra work, and had lost on the sale of his tools, shanties, &c.

The answer denies the material allegations in the bill.

Proofs were introduced.

Before going into the evidence, however, a couple of preliminary questions must be settled.

The act of 1848, under which this suit was instituted, required, in section 4, that "two of the persons to be appointed [as arbitrators] by the governor, under the provisions of the first section of this act, shall be men of legal attainments, and before," &c.

A plea in abatement was filed at the meeting of the arbitrators, averring that no two of them were men of legal attainments. The plea was demurred to and the demurrer sustained.

We think this decision was right. The statute requires no particular degree of legal attainments in the arbitrators, and almost every man in this country possesses some. The statute points to no test by which the question could be decided. It does not say the arbitrators should be judges, licensed lawyers, justices of the peace, or men of any particular class. Suppose issue had been taken on the plea and evidence introduced, what would have been the rule of decision? From the indefiniteness of the act in this particular, we think it was merely directory to the governor, and that his action in the premises could not be reviewed in the proceedings.

The remaining preliminary question relates to the power of this Court over the case.

The statute referring the case to arbitration gives an appeal to the Supreme Court, and provides, in section 10, that said Court may set aside the award for misconduct, &c., in the arbitrators; and in section 11 that the Court may modify it for certain causes; and, in section

12, that "if said case shall be taken to the Supreme Court, said Court may fully examine into the merits of the same, and decide it according to law and justice." The last section gives the Court unlimited power over the cause, and the previous ones do not expressly limit it. We have concluded that it is our duty to examine the case ¸upon its merits. And we may properly remark, that in doing so, we shall be governed by the rules of law applicable to ordinary suits in courts of justice, and that if any amount of money is awarded to *McGinley*, it will be because he is legally entitled to it. Had the legislature intended that he should have it upon any other ground, they would not have referred his cause to a legal tribunal, but have voted the amount they wished him to have directly from the state treasury.

The contract between *McGinley* and the state provided that if he failed in complying with the terms of said contract, the engineer might declare it forfeited and null, the state might withhold ten per cent. of the amount of work performed under the contract, and relet the job to another. The engineer did make such declaration. *McGinley* brings this suit, alleging that such declaration was wrongfully made, and the proof of the allegation devolves upon him. The first question, therefore, is, has *McGinley* shown that he complied with his contract in building the abutments of said *Silver* creek bridge, so far as he progressed with them? If he has not, he has shown no ground for recovering damages for the breach of the contract, none for recovering expenses of preparation or losses from sale of tools, &c. Twelve witnesses have testified to this point. Eight of them, *Jesse L. Williams, Lazarus B. Wilson, John Frazier, Peter Martineau, Charles G. Voorhies, D. Lapham, W. H. Price*, and *C. A. Ogden*, all engineers of character, unequivocally condemn *McGinley's* work, and say it was not in accordance with his contract; that it was not done in a workmanlike manner, without reference to the *Wills* creek bridge as a standard of comparison. Many defects are pointed out. It was not well grouted, had not sufficient headers, the backing was not

properly laid, the joints were too open, &c., &c. *Williams* had personally examined the work and taken up portions of it. *Voorhies* had inspected its surface. *Martineau* had examined it. *Frazier* says when he examined it he inserted his hand and riding switch in the joints of the exterior face of the walls. These men could not, therefore, be mistaken. Four of the witnesses, *David Hearsum, J. Lutz, L. B. Stoughton*, and *L. D. Coburn*, do not condemn *McGinley's* work. *Hearsum*, assistant resident engineer, who was discharged from the service of the state for incompetency, states that the work and materials were entirely good and sufficient. *Coburn*, a mason who worked on the bridge, thinks it "was reasonably well done"—well enough for the place the bridge occupied. *Lutz* and *Stoughton, Kentucky* engineers, think the work well enough executed for a bridge across so small a stream; they think mortar and grout were unnecessary. *Lutz* says—"In regard to the defects of the work I must observe that they would only show themselves if the plan of the bridge contained a smaller amount of materials; in that case, a greater number of tiers and more accuracy in the backing would have been required." Other witnesses testify to the good quality of the materials used by *McGinley*.

It is impossible upon this evidence to say that *McGinley* had complied with his contract in executing the masonry of the abutments for the *Silver* creek bridge, and that the engineer erred in declaring it forfeited. The evidence is decisive to the contrary. It is said that there are discrepancies in the testimony; but we discover none that weaken its force upon this point. It is also said that the work has stood some fourteen years, and that that is evidence for *McGinley*. That does not prove that it was done according to contract, nor that it will stand as long as it would were it so done. It is also to be remembered that a wooden structure was finally placed upon that work instead of a stone arch, as was at first contemplated. But the position is taken that as the work of *McGinley* was sanctioned as it progressed, by *Hearsum*, assistant resident

engineer, and by *Maxwell*, one of the board of internal improvement, the state is now estopped to dispute that the work conforms to the contract. To this position we cannot assent. The general management of the internal improvement system of *Indiana* was committed by law to a board of internal improvement. That board was not composed of engineers or artisans' of any kind. The board was empowered to appoint a chief and the necessary subordinate engineers, to whom the oversight of the construction of the works was committed, and to some of whom in each case was entrusted the power of declaring the contract for the construction of that particular work forfeited for non-compliance with the contract. This mere statement shows that the member of the board of public works was not the person to approve or disapprove of the contractor's work. And as to the engineer, his power was subordinate to the contract. That was the controlling authority. We understand the matter in this way: The state makes a contract with an individual for the construction of a bridge in a good workmanlike manner, and sometimes with the further stipulation that the work shall be of a kind and of materials named in certain specifications, or, as in this case, contained in a model referred to as a standing specification at the making of the contract. Now, the contractor is presumed and bound to know himself the character of the work required by his contract, and how to do it; and he is bound to do it rightly. But, as his work, when the job is complete, will much of it be concealed from inspection, an engineer remains with the contractor, not to discharge him from the fulfillment of his contract, but to see that the work, as it progresses, is all done according to the contract. But it is said the contractor is in all things to follow the directions of the engineer or his assistant. He is, in all things wherein the engineer or assistant has a right to direct him. For instance, the contract provides that he shall dismiss disorderly hands when directed by the engineer or assistant. He shall not employ hands from other jobs when so directed. He would be bound to increase his force in order

to secure the completion of his job in time, when so directed, &c.; and so in cases of doubt as to the meaning of the contract. But if the engineer should tell the contractor to build his abutments of mud, when the contract required him to build them of stone, we think he would not be bound nor have a right to follow such a direction, for it would not be a direction the engineer would have power to give; and an attempt to dispense with the contract and accept defective work would indicate a fraudulent collusion between the engineer and contractor for the purpose of cheating the state. Nor did *McGinley* understand that the sanction of the assistant engineer protected him; for when, on the 5th of *October, Williams,* the chief engineer, directed him to suspend his work on account of the defective character of that he was performing, he did not answer that it was approved by *Hearsum,* the assistant resident engineer, though such was the fact, but went to *Kentucky* to obtain engineers who would say the work fulfilled his contract. But even if the principal or resident engineer would have such power, the assistant resident engineer would not, for he is not authorized by the contract to furnish a plan of the work, or to accept it when done. These things are to be done by the principal or resident engineer, by the express terms of the contract. While specifying some things, the contract speaks of the *assistant* resident engineer as having power to perform them; but in that part of the contract relative to accepting the work, &c., the word assistant is dropped, as it would seem, *ex industria.* Were the doctrine contended for by *McGinley's* counsel correct, a contract would be an idle and useless thing. But conceding, for the sake of the argument, that the state was bound by *Hearsum's* approval while he was acting in the absence of the resident and chief engineer, and that the contractor was bound to obey in all things the direction of the engineer, still it will not help the case for *McGinley;* for when *Williams,* the chief engineer, arrived to inspect the work, on the 5th of *October,* his authority was

paramount to and superseded *Hearsum's*, and *Williams* then condemned the work and ordered *McGinley* to suspend, &c., yet *McGinley* disobeyed the order and direction of the engineer, and proceeded with the work in a manner, so far as the testimony shows, no better than he had been doing before; and this very conduct is made the ground of declaring the contract forfeited by *Fauntleroy*, the resident engineer, as appears by his declaration copied into the forepart of this opinion.

*McGinley*, then, having failed in complying with his agreement, and the same having been rightly declared forfeited, he can at best be entitled only to compensation for the work done and materials furnished by him towards the bridge, less ten per cent. as a forfeit.

He has been paid 21,814 dollars, and must have done work and furnished materials to entitle him to that sum, in round numbers, to the value of 24,300 dollars.

Five witnesses may be said to have made estimates of his work and materials. Most of said witnesses also estimate the quantity of materials and cost of work for the whole bridge, and doubtless make both too low ; but this does not affect their estimates of the work actually done and materials furnished by *McGinley*. In their estimates of quantities for the whole bridge, they are too low in the expensive as well as in the cheap work, and as *McGinley* was paid by the perch for the whole, be it more or less, it does not impair the correctness of their calculations of what he had done which could be accurately measured, and in the quantity of which the witnesses do not greatly vary, the difference in their results being mostly produced by the difference in opinion as to the relative value, as it is termed. And we must necessarily be governed by the preponderance of the evidence upon these points, as well as upon others. We cannot go and measure and estimate ourselves. And could we measure the work and determine its quantity, we still should have to depend upon witnesses of skill in the matter, to determine its relative value as compared with equal quantities

of work in other parts of the job, such being the rule in estimating work upon contracts of this character. *McGinley* claims for—

1. Extra excavation on the change of plan of bridge;

2. Extra excavation for the foundation of the abutments on the first plan, and artificial foundation;

3. For masonry and materials in the abutments.

In regard to the first item, the evidence furnishes no data for calculating any amount; and *Hearsum* tells us that at the change, which consisted in setting the foundation some further back, one hundred and sixteen perches of stone had been laid, which, on being relaid, were re-estimated to *McGinley* both in materials and work. We presume paying him for the materials twice was considered a sufficient compensation for the additional excavation.

For the second of the above items *Hearsum* allows him 4,500 dollars.

The third is the principal one. As we have remarked, five witnesses have testified in regard to it. *Wilson* makes this item 19,539 dollars. *Voorhies* makes it 17,335 dollars. *Martineau* makes it 13,027 dollars.

This third witness states that his estimate is upon accurate measurement of all the work and materials done and furnished by *McGinley*. Now if we add to either of the above sums the 4,500 dollars for extra excavation and artificial foundation, the amount will still be below the 24,300 dollars to which *McGinley's* work should amount, to entitle him to the sum he has already received.

*Hearsum's* estimate, exclusive of the 4,500 dollars, is 26,728 dollars. . Without specifying all his objections, *Williams* makes *Hearsum's* estimate about 8,000 dollars too high, on account of his placing an erroneous relative value upon the part of the job done. · *Hearsum* also was but an assistant resident engineer, and was discharged from the service of the state for incompetency. His estimate, therefore, cannot be entitled to greater confidence, at all events, than those of the other witnesses. He states also that he estimated to *McGinley* the timbers (grillage),

in the artificial foundation, as so much masonry, and that he also includes the value of said foundation in his allowance of 4,500 dollars extra. He would seem to have given the price of that foundation to *McGinley* twice. It measures, as masonry, two hundred and twenty-two perches. But allow the estimates of the five witnesses to stand at the sums they have fixed, putting that of *Jesse L. Williams* at 18,728 dollars, 8,000 less than *Hearsum's*, and take the mean of those estimates, and the result is but 18,753 dollars; to which add the 4,500 extra, and the sum is still over 1,000 dollars below the amount that *McGinley* should have done upon the job to justify him in retaining the sum he has received.

It should also be remembered that one hundred and seventy perches of stone were laid by *McGinley* after he was ordered to stop by the principal engineer; that three hundred and thirty perches of his work were taken down at an expense of over 500 dollars to the state, and, of course, relaid; and that the officers deemed it necessary to change the plan of the bridge to a wooden structure on account of the defective character of *McGinley's* work. In view of all these things, we do not see that in this case the application of the law works any injustice to *McGinley*.

SMITH, J.—Having been unable to agree to the decision made by the majority of the Court in this case, I shall be obliged, in order to give a clear exposition of my views, to set out the facts proved at considerable length.

On the 1st of *March*, 1837, *Patrick McGinley* entered into a written contract with the state, represented by *David Maxwell*, acting commissioner of the *Jeffersonville* and *Crawfordsville* road, to build, in a substantial and workmanlike manner, a stone bridge over *Silver* creek, on the line of said road. The bridge was to be built according to a plan to be furnished by the principal or resident engineer on said road, and to be paid for at the rate of 7 dollars and 75 cents per perch of twenty-five cubic feet. The contract contained these further stipulations, " that

if, in the opinion of the engineer, the party of the second part should unreasonably neglect to prosecute, with a force proportionate to the quantity of work to be done and the period in which it is to be completed, or shall sub-contract or relet said work, or shall not give personal superintendence to the work, or shall refuse at any time to conform to the directions and instructions of the engineer or assistant engineer, or shall fail to dismiss any disorderly, quarrelsome, or disobedient person as aforesaid, or shall violate in any way or manner any of the stipulations, provisions, or conditions of this contract, the engineer shall have power to declare this contract forfeited and null and void, and on his declaration the same shall cease and determine forever, and the said party of the first part may proceed to relet the same; and in case of such declaration of forfeiture, the said state of *Indiana* is to retain the per centage herein before mentioned, [being ten per cent. retained on the periodical estimates] on the whole amount of said work done at that time, forever, as compensation for damages, which it is hereby agreed by the parties thereto that the said state of *Indiana* shall be entitled to, in consequence of the failure of the party of the second part to perform the stipulations of this contract." It was also agreed by the parties, "that in case any difference should at any time arise between the parties hereto as to the construction of this contract, and the true intent and meaning thereof, that such difference shall be considered and decided by the said engineer; and the said parties do hereby submit all and singular the premises to his award, arbitrament, and decision, and agree that the same shall be final and conclusive between them, to all intents and purposes."

Under this contract *McGinley* commenced to build a bridge at the point designated, and continued his operations until the 5th of *October*, 1837. At the time of the letting, the water in the creek was too high to admit an examination of its bed, but from a partial examination the engineers supposed the bed of the creek consisted of

solid rock, and so represented it to *McGinley*. It was afterwards found, however, that the bed of the creek was an aluminous slate, and that the abutments would require expensive artificial foundations. Upon this discovery, *McGinley* refused to proceed with the work without compensation for the extra expense of the foundations, and he was then assured by the agents of the state that such extra expense would be allowed him.

*McGinley* was first furnished with a plan for a bridge with two spans of fifty feet each, with a pier in the middle, and he had laid one abutment about four feet high, when the plan was changed so as to have but one span of eighty feet, by which change the work done became useless and was removed. This change in the plan occasioned further additional expense to the contractor, by causing such a delay of the work that he was not able to get it out of the way of a flood which afterwards occurred and filled the excavations for the foundations. He however commenced building the abutments and wing-walls according to the new plan furnished by the engineers, and had, at the date last mentioned, laid about two thousand perches of masonry, and had transported to the site of the bridge a large quantity of stone and other materials which had not yet been put into the walls. He had also incurred heavy expenses in opening several quarries in *Kentucky* and in this state, in making roads, in providing shanties, teams, boats, cranes, and other apparatus necessary for the completion of such a contract.

The work was done under the superintendence of *David Hearsum*, who had been duly appointed acting resident engineer to take charge of it, and continued to hold that office from the 1st of *March*, 1837, until *February*, 1838. *Henry M. Pettit* was the principal engineer of the state until about the 1st of *August*, 1837. *Robert H. Fauntleroy* was the principal assistant engineer on the line of the *Jeffersonville* and *Crawfordsville* road. During the period that *McGinley* was prosecuting his work, Mr. *Fauntleroy* visited it but two or three times. Mr. *Pettit*

visited it occasionally during the time he was in the service of the state, and Mr. *Maxwell*, the acting commissioner, visited it monthly.

Mr. *Hearsum* visited the work daily. He inspected all the materials, directed and inspected the cutting of the stone to the proper size and shape, and gave directions as to the manner in which they should be laid. He states in his deposition that the walls were well built, that there were sufficient headers inserted in the structure in a manner approved by him, that there was no part of a course without headers, that no part of the masonry was laid without mortar, that the whole interior of wall was grouted in each course according to his directions, that every part of the work was done according to his instructions, to his entire approbation, and that the work was so done throughout that the bond was not only good but excellent.

At the time Mr. *Pettit* left the service of the state, the foundations of the abutments were laid, and a large quantity of materials had been furnished for the walls. He also states that as far as the work had progressed, it was done to his entire satisfaction, and that the materials provided were excellent. Mr. *Fauntleroy*, on being asked if the directions given to *McGinley* had been followed by him, only says that he was informed by Mr. *Hearsum* that *McGinley* had performed all that was required of him.

No complaint of the work done by *McGinley* appears to have been made until the 5th of *October*, 1837. On that day Mr. *Williams* first visited the bridge and spent part of a day in examining it. He had been appointed principal engineer of the state in charge of the works in progress during the previous month of *September*. He states that he found the masonry defective and wholly unsuited to sustain a stone arch of so great a span. The prominent defects pointed out by him were, that the abutments had been built without front headers, that many of the face stones were too narrow, that the bed joints were too open, that many of the backing stones were too small, and that the cavities between the stones were not suffi-

ciently filled with grout or mortar. In consequence of finding these defects, he told *McGinley* it was his duty to require the work to be suspended, a part of it taken down, and an entire change in its character effected.

The substance of this direction he afterwards embodied in the following letter which he handed to *McGinley* in *Louisville* on the next day, as he was about leaving for another part of the state.

"*New Albany*, *Oct.* 5th, 1837: *Patrick McGinley*, contractor, &c.: Sir—In discharge of the duties with which I have recently been charged by the board of internal improvements, I have to-day examined for the first time the masonry in the abutments of *Silver* creek bridge. I find the work to be of a very imperfect character, both in material and workmanship, and wholly unsuited to sustain an arch of so great a span. It therefore becomes my duty to direct an immediate suspension of the work. The greater part, if not the whole, of the masonry now laid must be removed, and other and better stone prepared before the work can be recommenced. And as the season for laying masonry is now nearly past, the work cannot be resumed until next spring. I regret very much the delay as well as the expense to the contractor which this decision will cause, but cannot do otherwise. The duty is imperative. An arch of this magnitude could not be sustained by abutments formed of such masonry. Respectfully, *J. L. Williams*, prin. engineer."

*McGinley* did not suspend the work as required by this letter, but continued working until about the 25th of *October*, when he finally suspended the work by the order of *Hearsum*, who continued to be the resident engineer, and who had been directed to give this order by Mr. *Fauntleroy*. During the period which intervened between the date of the letter of Mr. *Williams* and his final suspension, he had added about one hundred and seventy perches to the abutments.

Mr. *Williams* revisited the work in the month of *December*, and finding that *McGinley* had not suspended the work according to his previous direction, the following

notice was served upon him by his order, and indorsed upon the contract:

" Whereas, on the 5th of *October*, the contractor for the *Silver* creek bridge was directed by the principal engineer to take down certain portions of the masonry, on account of its imperfect character, and whereas the contractor refused to follow such directions, but continued his operations, covering up the defective work; therefore, in performance of my duty to the state, and by virtue of authority vested in the engineer by the terms of this agreement, I hereby declare the within contract forfeited, null and void. *Dec.* 11th, 1837. *R. H. Fauntleroy*, resident engineer *Jeffersonville* and *Crawfordsville* road."

After this declaration of forfeiture the work was relet to other contractors, who under the direction of Mr. *Martineau*, who had succeeded Mr. *Hearsum* as resident engineer, took down three hundred and thirty perches of the masonry laid by *McGinley*, and then proceeded to finish the structure.

*McGinley* had received in payment for the work done by him 21,814 dollars. Soon after the work was finally suspended, namely, on the 11th of *November*, 1837, *Hearsum*, who was still the engineer in charge of the work, made an estimate of the work done and materials furnished which amounted to 26,374 dollars and 72 cents. This estimate he says was based upon a fair calculation of the relative value of the work done in proportion to the whole. It does not include the cost of the artificial foundations, which he estimates at 4,500 dollars, nor the cost of removing the part of the abutment which had been built before the plan was changed, nor any allowance for expenses in making preparation for the work.

The witnesses who testified on behalf of the state as to the value of the work done, differ from *Hearsum* widely in their estimates of the number of perches that would have been contained in the whole work when complete, and of the relative value of that part of it done by *McGinley*. The dimensions of the bridge according to the last plan furnished *McGinley*, were as follows:

The abutments were twenty-four feet by thirty-six feet at the base, with a square offset of one foot at every six feet in height. The wing-walls were thirty-six feet by fourteen feet, with a square offset as before. The abutments and wing-walls were straight in front, battered one half inch to the foot rise on the sides to the chord line. Height of abutments and wing-walls sixty-two feet six inches. Height of parapet walls five feet. Chord of arch eighty feet. Versed sine thirty feet. Thickness of crown of arch five feet. The arch stone three feet six inches deep at the chord line, and tapering to two feet nine inches at the crown. The haunches of the arch were to be loaded with dead weight. There were also buttresses, the dimensions of which are not given.

*Hearsum* calculates the whole contents of the structure at nine thousand two hundred and twenty-nine perches. *Martineau* estimates the whole number of perches at seven thousand one hundred and nine and one half, and his calculations are evidently erroneous in several important particulars. The error here made is also carried into the calculations of all the other witnesses, for they all base their estimates upon the data furnished by *Martineau* as to the dimensions of the different parts of the work, none of them having seen the plan.

The first and most important question, however, that occurs in considering this case upon its merits is, whether the evidence shows that *McGinley* had failed in the performance of the stipulations of his contract in such manner that it was justly forfeited in consequence of his default. As I differ from the majority of the Court upon this point, I do not think it necessary to examine any of the subordinate questions, or the question relating to the jurisdiction of this Court, though I do not think the latter is free from doubt.

If the complainant had forfeited his contract by his own fault, it may be that he has received as much as he was strictly entitled to; but if he had not, I think there can be no doubt that he has been greatly injured and has incurred heavy losses for which he ought to be compen-

sated.   I shall therefore confine myself to the examination of this point.

The majority of the Court arrive at the conclusion that *McGinley* had forfeited his contract upon one of three grounds: first, because it was a part of the contract that the work should be done in a similar manner to that of the *Wills* creek bridge on the *Cumberland* road, and it was not so done; or, secondly, because he did not do his work in a workmanlike manner, in accordance with his contract; or, thirdly, that his disobedience of the directions given him by Mr. *Williams* on the 5th of *October*, 1837, justified the engineer in declaring his contract forfeited.

The only evidence upon which the first of these grounds can be supported is as follows: Mr. *Pettit* says that at the time of the letting he referred *McGinley* to the bridge across *Wills* creek, as exhibiting the character of the masonry that would be required on the *Silver* creek bridge, to enable him to bid understandingly; and Mr. *Williams* says he heard *McGinley* say that Mr. *Pettit*, at the time of the letting, referred him to the *Wills* creek bridge, on the *National* road, and told him that the masonry of the *Silver* creek bridge would be of a similar character.

Giving the fullest effect to this evidence, I cannot agree that the representations thus made should be considered as forming a part of the contract.   They were made before any contract was entered into, and before it was known that any contract would be made.   They seem to have been made simply to inform *McGinley* of the general nature of the contract that would be required of him if his bid should be accepted, and would no doubt have justified him in refusing to enter into a contract even after his bid had been accepted, had one differing from those representations been required of him, if he did not choose to accept it.   But if he was willing to enter into a contract varying from such representations, it would not be any the less binding.

The contract actually entered into was not that the bridge should be built like the *Wills* creek bridge, but according to a plan to be furnished by the engineer, and

that in executing or carrying out this plan he should conform to the directions of the engineer in charge of the work. I think it could hardly be contended, when a plan was furnished, and directions as to the manner of executing it were given him by the engineer, he would have been justified in refusing to conform to such plan or directions, on the ground that the *Wills* creek bridge was constructed differently, or that such representations made to him prior to his entering into the contract would have afforded him any excuse for such disobedience. There is no principle of law better settled than that parol agreements, even when made contemporaneously, cannot be permitted to vary or enlarge the stipulations of a written contract.

If he had been deceived, indeed, by such previous representations in relation to what would be required of him under a power of direction which the other party retained, he might, even after the contract was entered into, when required to incur greater expense than he had thus been led to expect, have made such deception a ground for rescinding the contract and refusing to perform it, but he would certainly have had no right to persist in constructing the bridge according to such representations and not according to the directions given him.

This may be exemplified by what occurred in relation to the foundations. The engineers had represented to *McGinley* that the bed of the creek afforded a solid foundation for the abutments, but upon commencing the work it was found that it did not, and that artificial foundations would be required. These artificial foundations added considerably to the expense, and *McGinley* refused to proceed until it was agreed that he should be paid for them as extra work. But it did not occur to him that he had any right to disobey the instructions of the engineers, and build the abutments without artificial foundations, because the *Wills* creek bridge had none. The contract provided that he should do the work as he was directed, and if he was led to make such a contract by deceptive representations, he might refuse to perform it, but if he went on

with the work, he would, notwithstanding, be bound to do it as the contract required.

It is in evidence that, after the contract was made, a plan was furnished *McGinley* giving the outlines and dimensions of the structure he was required to erect, and that he commenced his work accordingly. It appears to be the general custom in undertakings of this kind for the engineers to furnish not only the outlines of the plan, but also specifications or directions in writing, specifying minutely the kind of materials to be used, and the particular mode and manner in which each part of the work is to be constructed. I understand, however, that such specifications are but subordinate parts of the general plan, for they would of course vary with the nature of the plan adopted.

In this case no such specifications were furnished *McGinley*, though he repeatedly demanded them. *Hearsum* says *McGinley* frequently asked him for such specifications, and he applied to Mr. *Pettit* for them. *Fauntleroy* also says *McGinley* demanded specifications of him, and he wrote urgently to Mr. *Pettit* to have them furnished. Mr. *Pettit* says he directed *Fauntleroy* to make out the specifications. For some reason they were not furnished, but neither *McGinley* nor any of the engineers seem to have had any idea that the workmanship of the *Wills* creek bridge was to serve as standing specifications, agreed upon at the time of entering into the contract. As I have before observed, the representations relative to the *Wills* creek bridge had been made before the contract was entered into, but even at the time of the contract no plan was furnished, and I suppose it was not possible for engineers to imagine a contract had been made for the specifications by which a plan for a bridge was to be carried out, before the plan itself had been determined upon.

No doubt one reason why neither the plan nor specifications were specified in the contract, was the consideration that circumstances might require changes of the plan as the work progressed, and consequently changes of the

specifications, and this may have been one cause why specifications were not afterward furnished. When some progress had been made with one abutment, the plan was changed from two arches of fifty feet span to one arch of eighty feet span, and it is not unreasonable to suppose that the contract was purposely drawn in the manner it was drawn, to give the engineers the power to make such changes as they should deem necessary, and to bind the contractor to do the work according to any plan and according to any directions they should think proper to give him.

For the above reasons, I am of opinion that the contract in evidence imports that *McGinley* was to build the bridge in question according to a plan to be furnished by the engineers, and to be governed in the execution of the work by the directions of the engineers, and that the evidence relative to the *Wills* creek bridge ought not to have any influence upon the decision of the questions arising as to his compliance with the terms of his contract.

The evidence relative to the workmanship of *McGinley* is contradictory. *Hearsum* says the work was done in precise accordance with his own instructions, and that it was in all respects sufficient and suitable for the plan which had been furnished. *Pettit* also says the work was done to his entire satisfaction, so far as it had progressed during his continuance in office, and that the materials furnished by *McGinley* were not only good but excellent. *Fauntleroy* gives no opinion as to the workmanship, but says so far as he was informed, *McGinley* had obeyed all the instructions given him.

Mr. *Staughton*, a bridge-builder by profession, and well acquainted with heavy masonry, having constructed many large bridges, says he was at this bridge and examined it frequently while in progress, and at the time the subsequent contractor was taking down a portion of it; that the rock used by *McGinley* were of sufficient size and good quality; that the work was well done and the masonry amply sufficient; that the backing stone used by the contractor were larger and better than those used by the subsequent contractor; that the work was well grout-

ed, and when a portion of the masonry was taken down, he thought it a pity to remove such work.

Mr. *Lutz*, a civil engineer of respectability and standing, says he had seen the work several times, and in *October*, 1837, gave it a thorough examination. He considered the materials used to be of the best quality and the workmanship sufficiently good, in fact stronger than the plan required. Mr. *Lutz* says, in regard to the defects of the work, "I must observe that they would only show themselves if the plan of the bridge contained a smaller amount of materials; in that case a greater number of tiers and more accuracy in the backing would have been required; but, under existing circumstances, regarding the plan of the bridge, I consider the workmanship amply sufficient to answer the desired end; indeed, I think that more work was done than was necessary for its durability and strength." I do not understand that Mr. *Lutz* here means to say that such defects as had been spoken of would have been more difficult to discover, but merely that a smaller structure would require greater accuracy of workmanship, and that what would be defects in a smaller structure would not be in one of the size of the *Silver* creek bridge.

Mr. *Coburn*, a mason who was employed by the subsequent contractors to superintend the taking down of such part of *McGinley's* work as was removed, says the work taken down was reasonably well done, and sufficiently so for the purpose for which it was intended. He also says that all of the stone taken down might have been relaid in the wall, and was relaid, with the exception of about five perches, with the knowledge of Mr. *Martineau*, who was then the resident engineer, and who visited the work every day. He says further, that the part of the work not taken down was well done, and he did not think it would ever give way.

Dr. *Whitman* says that soon after the work was reported to have been suspended, he was at the bridge and found Mr. *Maxwell* there examining it; that Mr. *Maxwell* said he thought there was not sufficient cause for the work

being stopped; and he and the witness then examined the masonry thoroughly, and especially to see if there was any opening in any joint in the face of it into which a man's hand could be thrust, and they could find none such, and none where the joints of the work opened to a greater width than the thickness of the blade of a large pocket-knife.

In addition to this testimony, there was evidence before the commissioners in *October*, 1849, that the work done by *McGinley* was then standing, unimpaired by time during the lapse of about twelve years, while the work done by the subsequent contractors was much injured, and some of it would have fallen if it had not been supported by strong iron rods.

It is true the design of having a stone arch was abandoned and a wooden superstructure substituted, but Mr. *Williams* says that the principal reason for making this change was an apprehension that there might be a settling of the artificial foundations. He explains that the abutments might settle several inches without doing any material injury to a wooden superstructure, because the frame could be righted up, while a yielding of only half an inch would be fatal to a stone arch, and would inevitably cause its destruction. Besides, several of the engineers say that an abutment sixty-two feet high, strong enough to support the embankment resting against it, would be amply sufficient to support a stone arch.

On the other hand, there are several witnesses who testify that, in their opinion, the work was not sufficiently well done to sustain the heavy arch that was to be placed upon it. Of these Messrs. *Williams* and *Martineau* had examined the work personally. Mr. *Voorhees* says he had only seen the exterior or face of the work laid by *McGinley*, and he thought a portion of it was not done in a workmanlike manner, some of the stone being thicker than others in the same course, which caused the joints to be more open than they should be and prevented the bearing being equal and uniform. Mr. *Wilson* says simply that he had seen the work, and the character of the

masonry laid was not such as he would have been willing to receive in a structure of the kind. Mr. *Fraser* was not examined as a witness. The expression of his mentioned in the opinion of the majority of the Court, is taken from a letter addressed by him to Mr. *Williams* shortly after the work had been suspended. Neither Major *Ogden*, Mr. *Lapham*, or Mr. *Price* had seen the work at all. Their opinions are founded wholly on representations of the character of the work furnished them by Messrs. *Williams* and *Martineau*.

I shall not, however, express any opinion in reference to the preponderance of this evidence as to the sufficiency of the workmanship, as, in the view I shall take of it, such an opinion is not necessary. If *McGinley* performed the work in the precise manner in which he was directed to perform it by the engineers authorized to give him directions, and there was no fraudulent collusion between him and them, I cannot perceive upon what ground he can be made responsible for such defects in the plan or construction as would render the work insufficient for the purpose for which it was designed.

That he did perform the work according to the directions given him by the engineers who were authorized to furnish him with plans and directions, up to the 5th of *October*, 1837, when Mr. *Williams* first visited the bridge, is indisputable. The only engineers from whom he had received any directions previous to that time, were Mr. *Pettit*, Mr. *Fauntleroy*, and Mr. *Hearsum*. Mr. *Pettit* was the engineer in chief, Mr. *Fauntleroy* the resident engineer for the line of road on which the bridge in question was located, and Mr. *Hearsum* an assistant engineer duly appointed to act as resident engineer *pro tem.*, as Mr. *Fauntleroy* was absent in a distant part of the state. In his capacity of resident engineer *pro tem.*, Mr. *Hearsum* visited the work every day, and, as stated by Mr. *Pettit* in his deposition, had the work under his entire control, and had all the powers of the resident engineer. He gave *McGinley* all the instructions he received, and as Mr. *Pettit* and Mr. *Fauntleroy* occasionally visited the work, it must be

presumed that *Hearsum* was himself governed, so far as was proper, by their directions to him, especially as neither of them testify that their instructions were in any respect disobeyed.

In the opinion of the majority of the Court it is said that *Hearsum* was only authorized to see that the contract was duly performed, and that he had no authority to give directions for the construction of the work differently from the specifications contracted for. That is no doubt true; but I think I have shown that no plan and no specifications were agreed upon in the contract, but that, in lieu of such plan and specifications, the agreement was that the work should be executed according to the directions of the engineers. This provision was no doubt intended to give the engineers a greater control over the contractor than they would have otherwise had, and enable them from time to time to make such changes in their plans, specifications, or directions, as circumstances might require. The authority to give instructions as to the manner in which the workmanship was to be performed was, therefore, expressly reserved in the contract.

It is true, in superintending such a contract, an engineer might give directions so manifestly improper as to show a fraudulent collusion with the contractor; but there can be no ground for any such supposition in this case. There is at least sufficient testimony to show that there was much difference of opinion, among persons skilled in such matters, as to whether the work was or was not sufficiently well done, and to rebut any presumption of fraudulent collusion arising solely from the fact that it was done according to *Hearsum's* directions.

Mr. *Pettit* says in his deposition, speaking of the artificial foundation, that the permanency of a foundation is to be judged of only by the engineer under whose instruction it is made, and, though defective, if approved of by the engineer, the defect cannot be laid to the charge of the contractor. The same principle must also be applicable to the abutments and other parts of a bridge, under a contract like the present. It certainly was not the duty

or the right of the contractor to determine what plan or what manner of executing a plan would be sufficient to sustain an arch of eighty feet span, but to execute the plan to be furnished him in such manner as he was directed. If he has done this, he has in all respects complied with his contract.

The principal defects found by Mr. *Williams* in the work executed by *McGinley*, were in the size of the stone used and the manner of dressing and laying them. *Hearsum* testifies in the most positive manner, that he himself personally superintended the dressing and laying of all the stone, that he gave directions as to the size, and that every part of the work was done in exact accordance with his directions. If, therefore, there were defects in the workmanship, they are to be attributed to his improper directions and not to the fault of *McGinley*.

Some stress is laid upon the fact that *Hearsum* was dismissed from the service of the state for incompetency. It is but justice to him, however, to state that there is no proof of his incompetency except the opinion of Mr. *Williams*, derived from the manner in which he had fulfilled his duties in superintending the construction of this bridge; and that he had performed those duties competently is supported at least by a respectable array of witnesses, who testify that the bridge was well constructed. But, however that may be, if *Hearsum* was incompetent, that was not the fault of *McGinley*. The state had undertaken to give him directions by competent engineers, and it was not for him to judge of their qualifications. If he had contracted to build a good and sufficient bridge, and had been left to furnish his own plan and specifications, the case would have been different. But as he contracted to build according to the plan and specifications to be furnished by engineers appointed by the state, he ought not to be held responsible for the sufficiency of the specifications of a plan any more than for the sufficiency of the plan itself. The permanency of such a structure would depend upon a variety of circumstances—as the dimensions of the abutments, the dimensions and direc-

tion of the wing-walls, the nature and quality of the materials used, and the particular manner in which those materials were put together so as to give to the whole structure a durable and sufficient bond. Each and all of such matters, it appears to me, fall within the province of the engineer to determine, and not the contractor, in cases like the present, and, therefore, I cannot agree that a sufficient cause has been shown for declaring the contract forfeited, previous to the 5th of *October*, 1837.

There still remains the question, Did the refusal of *McGinley* to conform to the directions given him by Mr. *Williams* on the 5th of *October*, justify the declaration of abandonment made on the 11th of *December* following? That declaration recites as the cause of declaring the contract forfeited, that the contractor had refused to obey the directions of the engineer to take down certain portions of the work on account of its defective character. This, however, is not exactly in accordance with the facts. There is no proof that Mr. *Williams* gave *McGinley* directions to take down any portion of the work. He informed him verbally, and in his letter of the 5th of *October*, that the greater part or the whole would have to be taken down, but gave him no directions but to suspend all work until the next spring.

*McGinley* then stood in this position: He had performed work to the amount of from 20,000 to 26,000 dollars, in part performance of his contract, and is suddenly informed that he must suspend the performance of the remainder for an indefinite period, and that the greater part, if not the whole, of what had been done must be taken down and rebuilt in a different manner, at his expense. Certainly he could not be required to do this, if the work he had done was done in strict accordance with his agreement.

Perhaps Mr. *Williams* had authority to order the work to be suspended indefinitely, or even to be finally abandoned, if he thought it would be unfit for the purposes for which it was designed, and it appears that this was in fact done, by the orders of Mr. *Fauntleroy*, on the 25th of

*October*, more than a month before the contract was declared forfeited. But this would be equivalent to a declaration on the part of the state that the contract should be no further prosecuted. If the contractor had, up to that time, performed all the stipulations of his contract, he could not be obliged to take down the work he had put up, or to suspend his work indefinitely at great loss to himself, without some provision being made for his compensation. Not being himself accountable for the alleged defects, it would be most unreasonable to require him to remedy them at his own expense.

If, therefore, the work was stopped by the state under such circumstances, the contractor had a right to recover the full value of the work he had done, and though it may be a question whether he should receive compensation for the work done after he was directed to stop, and whether he would not be chargeable with the expense of taking it down, I cannot admit that, of itself, the performance of that additional work afforded sufficient grounds for declaring the contract forfeited for his fault.

*Per Curiam.*—The award of the arbitrators is set aside with costs, and it is adjudged by this Court that *McGinley* take nothing by this suit.

*J. Morrison* and *S. Major*, for the state. .

*J. G. Marshall* and *R. Crawford*, for the appellee.